UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| RICHARD BISHOP,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>M. COLVILL and GRAMS,<br><br>　　　　Defendants. | CAUSE NO. 3:20-CV-1064-JD |

## OPINION AND ORDER

Richard Bishop, a prisoner without a lawyer, is proceeding in this case on one claim "against M. Colvill and Grams in their individual capacities for compensatory and punitive damages for failing to protect him from the second attack by Woods on February 22, 2020, in violation of the Eighth Amendment[.]" ECF 8 at 9. The defendants filed a motion for summary judgment. ECF 96. Bishop filed a response, and defendants filed a reply. ECF 101, 106. The summary judgment motion is now fully briefed and ripe for ruling.

### I. FACTS[1]

Bishop, a prisoner at Indiana State Prison ("ISP"), was housed in the Protective Custody Unit ("PCU") on February 22, 2020, when he got into a fight with another offender, Woods, who was also housed in the PCU. ECF 2 at ¶¶ 1, 7. As Bishop describes it, he stepped out of his cell on the upper tier to talk to Woods, who was

---

[1] These facts are taken in the light most favorable to Bishop, the non-moving party, and all reasonable inferences are drawn in his favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003).

walking down the stairs. ECF 103 at ¶ 23. Woods came back up the stairs, approached him, and got into his face. *Id.* at ¶ 24. A few seconds later, Woods pushed Bishop, Bishop backhanded him in response, and the two men started fighting. *Id.* at ¶ 26. A video of the incident shows they became entangled and Woods began punching Bishop in the head. ECF 31. Officer Grams, who was sitting in the officer's cage, yelled for the two of them to stop fighting. ECF 103 at ¶ 27. The two men separated. ECF 31. The physical part of the fight lasted about 30 seconds. *Id.*

Woods walked to the front of the cell block and yelled to Officer Grams that they had stopped fighting. ECF 103 at ¶ 8. Bishop believed the problem between them was over and walked down the stairs towards the back of the cell block. *Id.* at ¶ 30. But Woods called out, "Bishop, you're a bitch. If you think this is over, you're an idiot. I'm going to fuck you up later." *Id.* at ¶ 32. This prompted Bishop to walk towards the front of the cell block and ask Officer Grams to open the gate so he could speak to her. *Id.*

Officer Grams opened the front gate of C Block. ECF 103 at ¶ 33. As Bishop exited the cell block, Woods followed him and pushed through when Bishop tried to close the gate. *Id.* Bishop told Officer Grams that he did not want to live around Woods any longer because of the fight and Woods' later threat. *Id.* at ¶ 35. Plus, in Bishop's words, Woods "closely and aggressively" followed him out of C Block to the officer's cage. *Id.* Woods' tone of voice at the officer's cage was "loud, confrontational, aggressive, and angry-sounding." *Id.* at ¶ 36.

The video shows that when Bishop and Woods first approached the officer's cage, they were standing next to each other and began arguing. ECF 108. After about a

2

minute, the two separated and Woods stood at the other end of the officer's cage, separated from Bishop by a table. *Id.* The conversation continued for the next minute and a half. *Id.* Bishop begged to be moved away from Woods because of the fight, his later threat, and the aggressive way he followed Bishop to the officer's cage. ECF 103 at ¶ 15. Woods kept interrupting, saying that Bishop was lying about the threat. *Id.* Woods, though, ultimately admitted that he made the threat, but claimed he didn't mean it. *Id.* Bishop maintained that he did not feel safe around Woods and wanted one of them moved. *Id.*

Woods then asked if he and Bishop were going to go to segregation. ECF 103 at ¶ 15. Officer Grams responded that she didn't know but ordered the two of them to lock into their cells until her supervisor arrived. *Id.* Neither one complied. *Id.* Instead, Woods walked back to Bishop's side, still at the cage with Officer Grams, and a few seconds later he said, "In that case," and punched Bishop in the head. *Id.* Bishop fell to the ground, and Woods continued to punch him until Bishop became unconscious. *Id.* The attack occurred less than four minutes after the two men first approached the officer's cage and while engaged in discussions with Officer Grams. ECF 108.

Officer Colvill was in a different cellblock in the PCU during the first fight and was not aware of it. ECF 65 at 4-5. She entered the scene in the middle of the conversation at the officer's cage. *Id.* at 5. She remembers that when she arrived, she heard Woods say he did not want to go to lockup. *Id.* Then, Officer Grams told them both to go to their cells, and Bishop said that was not a solution for him because he did not want to live next to Woods any longer. *Id.*

## II. ANALYSIS

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable [factfinder] could [find] for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009).

The Eighth Amendment imposes a duty on prison officials "to take reasonable measures to guarantee the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Id.* at 833. "[I]n order to state a section 1983 claim against prison officials for failure to protect, [a plaintiff] must establish: (1) that he was incarcerated under conditions posing a substantial risk of serious harm and (2) that the defendants acted with deliberate indifference to his health or safety." *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (quotation marks omitted). Deliberate indifference is "something

4

approaching a total unconcern for a prisoner's welfare in the face of serious risks," or a "conscious, culpable refusal" to prevent harm. *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). To prevail, the plaintiff must establish that the defendant "had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago*, 599 F.3d at 756.

In the context of failure to protect cases, the Seventh Circuit has equated "substantial risk" to "risks so great that they are almost certain to materialize if nothing is done." *Brown v. Budz*, 398 F.3d 904, 911 (7th Cir. 2005). In such cases, "a prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996). "[T]he fact that an inmate sought and was denied protective custody is not dispositive of the fact that prison officials were therefore deliberately indifferent to his safety." *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997). Moreover, "[e]xercising poor judgment . . . falls short of meeting the standard of consciously disregarding a known risk to his safety." *Id.* at 554. "[T]he mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002).

### *Officer Chelsea Grams*

Officer Grams argues she did not have actual knowledge that Woods posed an impending risk to Bishop. As *Klebanowski* instructs, a prior fight, without more, does not provide a basis to find subjective awareness of a future risk. *Klebanowski v. Sheahan*, 540

5

F.3d 633, 639-40 (7th Cir. 2008) (concluding that subjective awareness of a risk cannot be inferred if "[jail] officers knew only that [plaintiff] had been involved in an altercation with three other inmates, and that he wanted a transfer because he feared for his life"). Awareness of a risk can be inferred if the prior fight was particularly violent, such as in *Peate v. McCann*, where the plaintiff was attacked with a laundry bag filled with rocks and correctional officers had to physically intervene to stop the fight. 294 F.3d at 881. There, the Seventh Circuit held that a reasonable jury could find a correctional officer was deliberately indifferent when he returned the laundry-bag weapon to the attacker "minutes after he had stopped the fight." *Id.* at 883. Here, the first fight between Bishop and Woods did not approach the level of violence in *Peate* and was rather short-lived as they stopped fighting as soon as directed by Officer Grams. Instead, it was more like the "minor fisticuffs" in *Owens v. Hinsley*, that the Seventh Circuit found insufficient to give defendants reason to believe the plaintiff "faced an imminent and substantial threat to his safety." 635 F.3d 950, 954 (7th Cir. 2011). Moreover, Bishop and Woods were engaged in discussions with Officer Grams in an effort to resolve the dispute. So, there was little reason for Officer Grams to believe that another fight would ensue so quickly. Thus, the first fight, alone, cannot provide a basis to find Officer Grams was aware that Woods posed a risk to Bishop.

Here, Bishop says he has more because Woods threatened him with future harm and followed him aggressively out of the cell block. ECF 101 at 8-9. Up until that threat, Bishop himself thought the threat was over. Thus, the first point at which it can be

6

reasonably inferred that Officer Grams had a subjective awareness of a risk to Bishop's safety was during the conversation at the officer's cage.

However, the nature of that threat determines what steps Officer Grams could reasonably be expected to take. *See Klebanowski*, 540 F.3d at 639 (noting officers must take "appropriate steps to protect [plaintiff] from the *specific* danger" they were actually aware of (emphasis added)). Here, no reasonable jury could conclude based on the evidence in the record that Woods posed an imminent threat that required immediate action. Although the conversation between Bishop and Woods became heated as they related the prior altercation to Officer Grams and argued over whether Woods had threatened Bishop, there is no indication that Officer Grams needed to take immediate action, rather than taking a few minutes to listen to the two sides and try to sort out what the issues were. *See Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004) (noting that correctional officer "must discriminate between serious risks of harm and feigned or imaged ones, which is not an easy task given the brief time and scant information available to make each of the many decisions that fill every day's work").

A key factor here is that Bishop showed no outward signs that he feared Woods in the moments before Woods attacked him. When Woods walked back to Bishop's side of the table, Bishop did not make any move to walk away from Woods, nor did he adopt a defensive position or give any other physical sign that he feared an imminent attack. ECF 108. The video shows that after Woods returned to Bishop's side and stood next to him, Bishop put his hands on his hips and turned his head towards Woods to continue the conversation. *Id.* The conversation continued for several more seconds

7

before Woods punched Bishop, seemingly out of nowhere. *Id.* Thus, the video disproves any contention that Officer Grams would have been aware that Woods posed an imminent risk to Bishop that was "almost certain to materialize if nothing [was] done." *Brown*, 398 F.3d at 911. The entire conversation in front of the officer's cage lasted less than four minutes before Woods punched Bishop. In the absence of any indication that violence was imminent, no reasonable jury could find that Officer Grams was deliberately indifferent to a known risk of harm to Bishop.

Bishop relies on two alleged policy violations as a basis to hold Officer Grams liable. First, he says her response to the initial fight violated prison policy, and had policy been followed, the second attack would not have happened. He claims that after the first fight, Officer Grams should have called for back-up, secured Bishop and Woods in mechanical restraints, removed them to Restrictive Status Housing, or used OC Spray to gain compliance as detailed in prison policy. ECF 101 at 6. Setting aside whether the policy is relevant to Bishop's claim, Officer Grams' actions did not violate the cited policy. The training module Bishop points to lists those actions as possible options if an officer "ordered both offenders to stop fighting and they refused." ECF 28-1 at 23. Here, Bishop and Woods obeyed her verbal command to stop fighting. A verbal order is a permissible action under the policy. Once Bishop and Woods complied, the policy does not give further guidance on how to proceed.

Bishop identifies another alleged policy violation and argues the court should use that to infer deliberate indifference. He says that after he and Woods did not immediately comply with Officer Grams' order to return to their cells and lock down,

8

she should have called a signal 7, used OC spray to gain compliance, used physical force to gain compliance, used a taser to gain compliance, used mechanical restraints, placed the weapons team on standby, or placed both Bishop and Woods in restricted housing. ECF 101 at 17. Looking at the training module, though, those options are possible responses in the case of a "disturbance (formerly called a riot)," for instance if "several offenders [are] being disorderly and refusing to lockdown." ECF 28-1 at 24-25. However, as discussed above, there was no indication that physical violence was imminent, and without any sign of an imminent threat, Officer Grams' decision not to demand immediate compliance and escalate the situation in the minute or two before the attack is not unreasonable.

Therefore, the evidence taken in a light most favorable to Bishop shows that no reasonable jury could conclude that Officer Gram was aware of an imminent risk to Bishop's safety. Thus, no reasonable jury could conclude her actions during the four minutes Bishop and Woods were arguing at the officer's cage amounted to anything more than negligence. Summary judgment is warranted in her favor.

*Officer Melonie Colvill*

Officer Colvill was aware of even less information than Officer Grams. It is undisputed that she did not see the first fight and only came upon the situation when Bishop and Woods were in the middle of the conversation at the officer's cage. ECF 65 at 4-5. Thus, all Officer Colvill knew was that the two men were having an argument, did not want to live in the same cellblock, and refused an order to return to their cells.

Bishop has not provided evidence that she was actually aware of any threat Woods posed to Bishop. Summary judgment is thus warranted in her favor.

### III. Motions

Finally, there are two pending motions to consider. First, Bishop filed a motion for the court to order the defendants to file all of the camera angles and for the court to review and consider the footage on summary judgment. ECF 105. He says that there are seven cameras in the Protective Custody Unit, and he wants the court to view footage from all seven cameras, which he says "will show different content and different angles of the relevant incidents." ECF 105 at 2. This is unnecessary. Defendants have attached a video showing the first fight. ECF 31. Another video shows Bishop and Woods entering the Recreation Area from C Block and approaching the officer's cage, then captures the entirety of their interaction in front of the officer's cage. ECF 108. Finally, the defendants attached a video from behind the officer's cage, facing Bishop and Woods during their conversations (though this angle is not very helpful because neither Bishop nor Woods can be seen very well through the bars of the officer's cage). *Id.* Bishop has not explained why additional angles will help his case other than to reinforce his statement that Woods aggressively pushed through the gate behind him. At summary judgment, the court accepts Bishop's version of events unless contradicted by video evidence. Given this, he has not shown that additional video is necessary or that it would help prove either officer had subjective knowledge of an imminent threat to him.

Second, Bishop filed a verified motion for sanctions. ECF 108. In it, he asks the court to impose sanctions on the defendants based on three statements in defendants'

10

reply brief that he contends are misstatements of fact. Specifically, he points to these statements:

- Plaintiff does not point to any specific threats for future violence that Woods made towards him after the first fight, but instead admits that he was discussing the possibility of a location move with Officer Grams while she was in the officer's cage. ECF 106 at 2.
- Plaintiff also admits that he and Offender Woods were telling Officer Grams different versions of whether or not an altercation or threat happened earlier. ECF 106 at 2.

He says his evidence shows that he reported Woods' threat to Officer Grams, so defendants' statement that he did not point to specific threats is false. ECF 109 at 2. He also says there is no evidence to support that he and Woods gave different versions of whether "an altercation" happened. *Id.* Finally, he says their statement that he and Woods gave different version of whether a "threat" happened misrepresents that although Woods initially denied threatening Bishop, he later admitted it but claimed he wasn't serious. *Id.*

Rule 11 requires attorneys and unrepresented parties to certify that to the best of their knowledge, their factual contentions have evidentiary support. Fed. R. Civ. P. 11(b)(3). "[A] court may impose sanctions on a party for making arguments or filing claims that are frivolous, legally unreasonable, without factual foundation, or asserted for an improper purpose." *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir. 1998). Here, the court will not analyze whether these passages are, in fact, inaccurate (defendants dispute this). ECF 110. Even if these passages identified by Bishop are inaccurate, this is not the type of situation where the court will impose Rule 11 sanctions. "[S]anctions are to be imposed sparingly, as they can have significant impact beyond the merits of the

11

individual case and can affect the reputation and creativity of counsel." *Hartmax Corp. v. Abboud*, 326 F.3d 862, 867 (7th Cir. 2003) (quotation marks omitted). Nitpicking a few statements in a reply brief will not support sanctioning the authoring attorney.

For these reasons, the court:

(1) DENIES the motion to file all camera angles (ECF 105) and the motion for sanctions (ECF 109);

(2) GRANTS the defendants' motion for summary judgment (ECF 96);

(3) DIRECTS the clerk to enter judgment for defendants and against Richard Bishop.

SO ORDERED on January 23, 2023

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT